FILED
2010 Jun-28  PM 12:00
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | | |
|---|---|---|
| **J. BROOKS LEACH,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 2:09-CV-575-VEH** |
| | ) | |
| **STATE FARM MUTUAL** | ) | |
| **AUTOMOBILE INSURANCE** | ) | |
| **COMPANY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

## I.    INTRODUCTION

Plaintiff J. Brooks Leach ("Mr. Leach") initiated this job discrimination case against Defendant State Farm Mutual Automobile Insurance Company ("State Farm") under the Age Discrimination in Employment Act ("ADEA") and the Family and Medical Leave Act ("FMLA") on March 23, 2009.  (Doc. 1).  In his lawsuit, Mr. Leach maintains that State Farm wrongfully discharged and retaliated against him in violation of the ADEA (counts one and two) as well as illegally interfered with his leave rights and retaliated against him in violation of the FMLA (counts three and four).  (Doc. 1 ¶¶ 31-44).

Pending before the court is State Farm's Motion for Summary Judgment (Doc.

18) (the "Motion") filed on April 19, 2010.  State Farm also filed supporting materials

on April 19, 2010.  (Docs. 19, 20).

On May 10, 2010, Mr. Leach opposed the Motion.  (Docs. 21, 22).  On May

21, 2010, State Farm filed a reply brief.  (Doc. 23).  No further briefing was filed by

either side, and the Motion is now under submission.  For the reasons explained

below, the Motion is due to be granted.

## II.    FACTUAL BACKGROUND[1]

Mr. Leach, a former Claims Litigation Attorney for State Farm, began his

employment with the company in 1992.  (Doc. 20 at Ex. B at 70).  On October 23,

2007, Mr. Leach's supervisor, Wade Anderson ("Mr. Anderson"), learned about a

---

[1]  Keeping in mind that when deciding a motion for summary judgment the
court must view the evidence and all factual inferences in the light most favorable to
the party opposing the motion, the court provides the following statement of facts.
*See Optimum Techs., Inc. v. Henkel Consumer Adhesives, Inc.*, 496 F.3d 1231, 1241
(11th Cir. 2007) (observing that, in connection with summary judgment, a court must
review all facts and inferences in a light most favorable to the non-moving party).
This statement does not represent actual findings of fact.  *See In re Celotex Corp.*,
487 F.3d 1320, 1328 (11th Cir. 2007).  Instead, the court has provided this statement
simply to place the court's legal analysis in the context of this particular case or
controversy.

Also, facts that are not material to the court's ruling on summary judgment
have not been included in this background.  For example, because State Farm has
assumed for purposes of this Motion that Mr. Leach has prima facially established
that he was replaced by a person under the age of forty, the court has not recited facts
relevant to the candidate who filled Mr. Leach's position subsequent to his separation
from State Farm.

chain email which Mr. Leach had forwarded to several different recipients and which had been brought to Mr. Anderson's attention by another State Farm employee, Jay Miller ("Mr. Miller"). (Doc. 20 at Ex. B at Ex. 3 at 1). Mr. Miller became aware of the chain email because one of Mr. Leach's recipients "took some offense" as to the contents of the communication and subsequently shared it with him. (Doc. 20 at Ex. B at Ex. 3 at 1).

Mr. Anderson emailed Mr. Leach that "[a]s [Mr. Miller] reminds us, forwarding a chain email is a violation of [State Farm's] Code of Conduct, regardless of the content." (Doc. 20 at Ex. B at Ex. 3 at 1). By email, Mr. Leach responded in part that he "bitterly resent[ed] any inference that [he] [had] violated some code of conduct" and requested that Mr. Anderson "forward [his] sentiment and explanation to Mr. Miller or anyone else as [he] s[aw] fit." (*Id.*).

Shortly after Mr. Anderson received this response from Mr. Leach, Mr. Anderson claims that Mr. Leach "passed by [his] office and told [him] to 'shove it up [his] ass.'" (Doc. 20 at Ex. B at Ex. 3 at 1). Mr. Leach denies that he made any such statement to Mr. Anderson. (Doc. 20 at Ex. B at 19).

According to Mr. Anderson, when he tried to speak further to Mr. Leach, Mr. Leach indicated that he did not want to talk and "that the accusation that he violated 'some kind of code' was insulting." (Doc. 20 at Ex. B at Ex. 3 at 1). Mr. Leach, on

3

the other hand, maintains that he and Mr. Anderson had a brief conversation when Mr. Anderson came into his office after receiving Mr. Leach's responsive email. (Doc. 22 at Ex. 1 at Ex. A at 1).  Based upon this series of events, Mr. Anderson ultimately sent Mr. Leach "home on leave without pay"[2] on October 23, 2007, and informed the Managing Attorney, David Turner ("Mr. Turner"), that he would "talk [with him] before taking any further action" regarding Mr. Leach.  (Doc. 20 at Ex. B at Ex. 3 at 1).

Mr. Turner then conducted an investigation into the chain email incident and turned over his findings and recommendations to Dean Davis ("Mr. Davis"), Associate General Counsel for State Farm, on November 12, 2007.  (Doc. 20 at Ex. A ¶¶ 1, 17,18; Doc. 20 at Ex. A at Ex. E at D-0819-D-0823).  One of Mr. Turner's suggestions to Mr. Davis was for State Farm to fire Mr. Leach.  (Doc. 20 at Ex. A ¶ 18).  Mr. Turner reached this recommendation on the basis that he believed Mr. Anderson's version of events pertaining to the chain mail incident (including Mr. Leach's use of profanity against his supervisor) over Mr. Leach's.  (Doc. 20 at Ex. A at Ex. E at D-0822 ("After reviewing the events of October 23, 2007, I do not find

---

[2] As State Farm explains "[a]lthough Anderson told Plaintiff he was being sent home without pay, it is undisputed that Plaintiff was paid for the time."  (Doc. 19 at 6 n.1 (citing Doc. 20 at Ex. B at 34); *see also* Doc. 20 at Ex. A at Ex. E at D-0822 ("The next day, Lamonica Ferrell called [Mr. Leach] to advise that he was to stay home in a company initiated pay status.")).

[Mr. Leach]'s account of events to be credible."); *id.* ("It is only after matters escalate in [Mr. Anderson's] follow up discussions with [Mr. Leach] that further action is required.")).

Taking into consideration the results of Mr. Turner's inquiry, Mr. Davis made the final decision to discharge Mr. Leach effective February 29, 2008.  (Doc. 20 at Ex. A ¶ 19).  In particular, Mr. Davis "ultimately decided that Mr. Leach's actions on October 23 combined with the several Performance Counselings he received relating to incivility to others warranted termination."[3] (Doc. 20 at Ex. A ¶ 19 (emphasis added); Doc. 20 at Ex. B at 9 at LEACH 30 ("I regret to advise you that the decision has been made to terminate your employment with State Farm effective February 29, 2008.")).

Mr. Davis notified Mr. Leach about the decision to discharge him by overnight mail dated November 19, 2007.  (Doc. 20 at Ex. B at Ex. 9 at LEACH 30).  From October 23, 2007, until November 23, 2007, Mr. Leach received four weeks of paid leave.  Mr. Davis further decided that State Farm would provide Mr. Leach with unpaid leave from November 24, 2007, through February 29, 2008, a total of fourteen

---

[3] While Mr. Leach notes that the "Performance Counseling History" of Mr. Turner's report was taken from the memorandum that was drafted by Mr. Anderson, Mr. Leach does not substantively challenge these prior counseling incidents and related documentation.  (Doc. 21 at 2-3 ¶ 9).

weeks, "to allow for [the] continuation of medical coverage related to [his] wife's recent medical procedure ([which had occurred on November 7, 2007, and] which [Mr. Leach] described in [an] earlier conversation) under the State Farm Medical Plan."[4]  (Doc. 20 at Ex. B at Ex. 9 at LEACH 30; Doc. 20 at Ex. B at 28).

Under the separation schedule formulated by Mr. Davis, Mr. Leach was eligible "to retire effective March 1, 2008, should [he] choose to do so."  (Doc. 20 at Ex. B at Ex. 9 at LEACH 30).  However, prior to the expiration of the unpaid leave period provided by State Farm, Mr. Leach contacted the company and notified it of his plans to retire effective January 1, 2008, as he had accepted a position with the Law Office of Earl Lawson, P.C., Liberty Mutual's claims litigation office, beginning on January 2, 2008.  (Doc. 20 at Ex. B at 62; *see also* Doc. 20 at Ex. B at Ex. 12 (Mr. Leach's email dated December 18, 2007, to Lamonica Ferrell, Human Resources Representative with State Farm's Atlanta Operations Center, advising of his retirement effective January 1, 2008); Doc. 20 at Ex. B at Ex. 11).

## III.   STANDARD OF REVIEW

### A.   Summary Judgment

Summary judgment is proper only when there is no genuine issue of material

---

[4]  Mr. Leach had also indicated to Mr. Anderson in late September 2007 that his wife "was very sick" and would be having surgery.  (Doc. 20 at Ex. 9 at 94).

fact and the moving party is entitled to judgment as a matter of law.  Fed. R . Civ. P.

56(c).  All reasonable doubts about the facts and all justifiable inferences are resolved

in favor of the nonmovant.  *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th

Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could

return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S.

242, 248 (1986).  "Once the moving party has properly supported its motion for

summary judgment, the burden shifts to the nonmoving party to 'come forward with

specific facts showing that there is a genuine issue for trial.'"  *International Stamp

Art, Inc. v. U.S. Postal Service*, 456 F.3d 1270, 1274 (11th Cir. 2006) (citing

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

### B.    Employment Discrimination Generally

A plaintiff in an employment discrimination case maintains the ultimate burden

of proving that the adverse employment decision was made because of intentional

discrimination.  *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133

(2000); *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509-12 (1993); *Nix v. WLCY

Radio/Rahall Comms.*, 738 F.2d 1181, 1184 (11th Cir. 1984).  Although the Supreme

Court previously established the basic allocation of burdens and order of proof in a

disparate treatment case,  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973);

*Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248 (1981); *Desert Palace v.*

*Costa*, 539 U.S. 90 (2003), that allocation scheme applies only in cases in which there is no direct evidence of discrimination. *Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 595 (11th Cir. 1987).[5]

Under the *McDonnell Douglas/Burdine* scheme, a plaintiff first has the burden of proving by a preponderance of evidence a *prima facie* case of discrimination. Second, once the plaintiff proves a *prima facie* case, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its employment decision. Finally, if the defendant carries its burden, the plaintiff must *either* prove by a preponderance of the evidence that the legitimate reasons offered by the defendant are merely a pretext for discrimination *or* present sufficient evidence, of any type, for a reasonable jury to conclude that discrimination was a "motivating factor" for the employment action, even though the defendant's legitimate reason may also be true or have played some role in the decision. *McDonnell Douglas*, 411 U.S. at 802-05; *Burdine*, 450 U.S. at 252-54; *Desert Palace*, 539 U.S. at 101-02.

---

[5] As the Eleventh Circuit has explained, "only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of age, . . . constitute direct evidence of discrimination." *Carter v. City of Miami*, 870 F.2d 578, 782 (11th Cir. 1989) (footnote omitted). Based upon this standard, Mr. Leach's case is purely a circumstantial evidence one, as his brief in opposition confirms. (*See, e.g.*, Doc. 21 at 7 ("In the absence of direct evidence of discrimination, the Plaintiff must demonstrate: . . . . ") (emphasis added)).

## IV.   ANALYSIS

Mr. Leach's complaint asserts four separate counts, and State Farm has moved for summary judgment as to all of them.  The court addresses each claim below.

### A.   ADEA Discrimination

#### 1.   Standard

The ADEA provides that "[i]t shall be unlawful for an employer . . . to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1).  In order to fall under the ADEA's protections, an employee must be "at least 40 years of age[,]" 29 U.S.C. § 631(a), and the plaintiff "retains the burden of persuasion to establish that age was the '<u>but-for</u>' cause of the employer's adverse action."[6]  *Gross v. FBL Financial Services, Inc.*, 129 S. Ct. 2343, 2351 (2009) (emphasis added).

The Eleventh Circuit "has adopted a variation" of the *prima facie* case standard articulated by the Supreme Court for Title VII claims in *McDonnell Douglas* for cases arising under the ADEA. *Mitchell v. Worldwide Underwriters Ins. Co.*, 967 F.2d 565, 566 (11th Cir.1992).  "Under this variation of the *McDonnell Douglas* test for

---

[6]  This ADEA "but-for" framework is in contrast to the <u>motivating factor</u> standard that is applicable in Title VII as well as other discrimination lawsuits.

establishing a *prima facie* case of discrimination, the plaintiff must show that he (1) was a member of the protected group of persons between the ages of 40 and 70, (2) was subject to adverse employment action, (3) was replaced with [or not selected for a position over] a person outside the protected group, and (4) was qualified to do the job." *Mitchell*, 967 F.2d at 566 (citation omitted); *see also Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1333 (11th Cir. 1998) ("To establish his *prima facie* case of discriminatory failure to promote, Standard must show that (1) he was in a protected group; (2) he was not given the promotion; (3) he was qualified for the position and (4) someone outside of the protected group was given the position.") (citation omitted).

"If this is done, the defendant has the burden of going forward and articulating a legitimate, non-discriminatory rationale for the [adverse employment action]." *Verbraeken v. Westinghouse Elec. Corp.*, 881 F.2d 1041, 1045 (11th Cir. 1989). "Finally, if the defendant rebuts the presumption of discrimination, the plaintiff must prove by a preponderance of the evidence that the employer's asserted reason is merely a pretext for a discriminatory [action]." *Id.* (footnote omitted).

## 2.    Application

Here, State Farm does not assert any challenges with respect to Mr. Leach's ability to establish a *prima facie* case of age discrimination.  Instead, State Farm's

Motion focuses upon Mr. Leach's failure to show pretext.  (*See* Doc. 19 at 15

("Assuming *arguendo* that Plaintiff can establish a *prima facie* case of discrimination,

he cannot adduce substantial evidence that State Farm's articulated reason for

terminating him is a lie.")).  State Farm's explanation for firing Mr. Leach was based

upon a two-year record of documented unprofessional behavior, including violating

State Farm's "Code of Conduct" by undisputedly forwarding "a chain letter type

email", as well as Mr. Leach's disputed verbal reaction made to his supervisor, Mr.

Anderson, after being informed via email on October 23, 2007, about his electronic

"Code of Conduct" violation.  (Doc. 20 at Ex. B at Ex. 3 at 1, 2).

　　　　As Mr. Davis explains in his declaration, regarding the decision to discharge

Mr. Leach:

> 　　　　Based on the fact that Mr. Leach was counseled repeatedly for his
> incivility to other attorneys, Claims Department staff, and his own
> supervisor, <u>and</u> his conclusion that Mr. Leach's version of the October
> 23 incident was not credible, <u>Turner recommended to me that State Farm
> terminate Mr. Leach's employment</u>.  (Ex. E, pp. 3-4.)  He further
> recommended that State Farm provide Mr. Leach with the full allotment
> of unpaid leave he is entitled to under State Farm policy by placing him
> on a unpaid leave through February 29, 2008.  (Ex. E, p. 4).
>
> 　　　　I took Turner's recommendation into consideration and reviewed
> the documentation Turner provided to me relating to the events of
> October 23 and Mr. Leach's performance generally.  <u>I ultimately
> decided that Mr. Leach's actions on October 23 combined with the
> several Performance Counselings he received relating to incivility to
> others warranted termination</u>.  I also decided that State Farm would

provide Mr. Leach with unpaid leave through February 29, 2008, fourteen total weeks, so that Mr. Leach could remain on State Farm's health insurance.  Since Mr. Leach was on Company Paid Leave from October 23 to November 23, he also received four weeks of paid leave.

(Doc. 20 at Ex. A ¶¶ 18-19 (emphasis added)).

The issue for the court is whether Mr. Leach has adduced sufficient evidence from which a reasonable jury could conclude that State Farm's explanation for firing Mr. Leach is a pretext–a lie–to cover up intentional unlawful age discrimination.  Mr. Leach relies upon certain remarks made by Mr. Anderson which Mr. Leach contends are ageist in character[7] and an application of the so-called "cat's paw" theory of liability to demonstrate pretext.

As the Eleventh Circuit has explained:

_____

[7] According to Mr. Leach's EEOC charge:

Wade [*i.e.*, Mr. Anderson] often made ageist statements.  He asked me, "How much longer do you plan to work?" on more than one occasion.  He also said, "There are a lot of firms downtown.  With your experience and background and record, you could get a job anywhere." He made this statement one or two times.  After attorneys Bibb Allen and Drew Redden died in 2007, Wade said to me, "They worked til they died.  You want to do that?"  When I commented on the terrible death of my friend Roy Bragg on May 11, 2007, Wade responded, "How are *you* feeling?"

(Doc. 22 at Ex. 1 at Ex. A).

One way of proving that the discriminatory animus behind the recommendation caused the discharge is under the "cat's paw" theory. This theory provides that causation may be established if the plaintiff shows that the decisionmaker followed the biased recommendation without independently investigating the complaint against the employee. In such a case, the recommender is using the decisionmaker as a mere conduit, or "cat's paw" to give effect to the recommender's discriminatory animus.

*Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1332 (11th Cir. 1999) (emphasis added).

In another more comparable "cat's paw" theory decision, the Eleventh Circuit further elaborated:

Wright also alleges that Phil Tatum's predecessor, Bill Bishop, made a number of statements reflecting an intent to terminate Wright because of his age. Specifically, Bishop repeatedly told Wright that he wanted to get rid of him because he had been around too long, and that he wanted to get a younger person into his position. However, because Bishop was not involved in the decision to terminate Wright, any discriminatory intent he may have possessed could not have been the cause of Wright's termination unless he somehow manipulated the decisionmakers (Powell and Tatum) into terminating Wright-for instance, by making a recommendation on which the decisionmakers relied, or by providing false information to the decisionmakers for consideration in their decision whether to retain Wright. *See Llampallas v. Mini-Circuits, Lab, Inc.*, 163 F.3d 1236, 1249 (11th Cir. 1998) (describing "cat's paw" theory of liability in employment discrimination cases, under which a person with discriminatory animus manipulates the decisionmaker). Bishop's only input into the termination decision was three letters he wrote to Wright (and placed in Wright's personnel file) in which he documented certain problems involving Wright's accounting procedures. These letters were in turn used by Powell and Tatum in their decision to terminate Wright. Wright has presented no evidence

that any misinformation was contained in the letters-in other words, he has presented no evidence that the accounting problems documented in the letters did not actually exist.  Consequently, there is no evidence that Bishop manipulated the decisionmakers, and thus any discriminatory intent on his part could not be said to be the cause of Wright's termination.  Any discriminatory intent harbored by Bishop is therefore irrelevant to the question of Southland's liability under the ADEA.  *See Holifield v. Reno*, 115 F.3d 1555, 1563-64 (11th Cir. 1997) ("'The biases of one who neither makes nor influences the challenged personnel decision are not probative in an employment discrimination case.' ") (quoting *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 10 (1st Cir. 1990)).

*Wright v. Southland Corp.*, 187 F.3d 1287, 1304 n.20 (11th Cir. 1999) (emphasis added).

In its reply brief, State Farm makes no contention that the comments made by Mr. Anderson are insufficient to demonstrate an age-related bias.  (Doc. 23 at 6 ("Even assuming that the benign comments Plaintiff attributes to Anderson can be characterized as 'ageist' . . . this evidence falls far short of establishing that State Farm's reason for terminating Plaintiff is a lie.") (emphasis added)).  Instead, State Farm maintains that, regardless of the discriminatory import of the language used by Mr. Anderson, Mr. Leach still has not adduced adequate evidence of pretext because Mr. Anderson was not the person who ultimately decided to fire Mr. Leach or, alternatively, the person who recommended that Mr. Leach be discharged.

Such a narrow construction of the "cat's paw" theory is inconsistent with the

Eleventh Circuit's reasoning in *Southland*, as explained above.  In this instance, Mr. Leach has adduced sufficient evidence that the key incident which resulted in his separation from State Farm, *i.e.*, his use of profanity against a supervisor, is disputed and that the supervisor involved in the incident may very well have harbored a discriminatory bias against older employees.  This set of facts, taken in a light most favorable to Mr. Leach, fits the "cat's paw" "manipulation of decisionmakers" framework, and summary judgment in favor of State Farm due to a failure of pretext with respect to age discrimination is due to be denied.

### 3.   Timeliness

However, State Farm also maintains that Mr. Leach's ADEA claim is procedurally untimely.  Because the court has concluded that Mr. Leach has adduced adequate evidence showing that the reason given for his separation may really have been a pretext for age discrimination due to the application of the "cat's paw" theory, it must reach the timeliness issue and decide whether equitable tolling principles are appropriately relied upon by Mr. Leach.  They are not, and summary judgment in favor of State Farm is due to be entered because Mr. Leach's ADEA claim is administratively stale.

As the Eleventh Circuit has explained equitable tolling:

> Again, the proper focus for when a statute of limitations begins

to run is the time of the discriminatory act. *Chardon*, 454 U.S. at 8, 102 S. Ct. 28; *Nance*, 186 F.3d at 1341. This rule would suggest that, among the three above dates, the first choice, April or May 1999, was the appropriate starting date of the limitations period for Byrd's claims. The Court finds, however, that this case bears sufficient similarity to *Sturniolo* to apply equitable tolling.  As such, the charging period did not begin until Byrd learned of the Company's hiring of Winters, or November 1, 1999. . . .

   In both *Hargett* and *Turlington*, the plaintiffs had sufficient evidence of their age discrimination claims to file an EEOC charge within the limitations period. In *Hargett*, the plaintiff learned of his younger replacement, but still waited eleven months to complete an EEOC questionnaire and another three months before filing an EEOC charge. In *Turlington*, the plaintiff had sufficient evidence of age discrimination when he was excluded from training programs available to his younger colleagues. His knowledge of this evidence was demonstrated by his vigorous protest and soliciting the help of a lawyer to combat his employer's practices. These decisions are wholly consistent with the rationale of the early case of *Reeb*:  The applicable limitations period did not begin to run until the facts supporting a cause of action became apparent or should have became apparent to a reasonably prudent person with concern for his or her rights.

*Jones   v. Dillard's, Inc.*, 331 F.3d 1259, 1266, 1267 (11th Cir. 2003) (emphasis added).

   In this lawsuit, the record reflects correspondence from Mr. Leach's counsel to State Farm dated as early as November 12, 2007, in which he opines that after "review[ing] documents" and having "numerous conversations and meetings[,]" Mr. Leach "has a valid cause of action against State Farm for age discrimination" due to "numerous" "ageist statements" made by Mr. Anderson to Mr. Leach. (Doc. 20 at Ex.

B at Ex. 8 at 1).  Further, while Mr. Leach was notified on November 20, 2007, about his separation from State Farm effective as of February 29, 2008, he did not file his charge of discrimination until August 27, 2008, over nine months later.  (Doc. 22 at Ex. 1 at Ex. A).

Therefore, while Mr. Leach did not learn of his younger replacement until March 1, 2008 (Doc. 22 at Ex. 4 ¶ 4), similar to *Turlington*, Mr. Leach still had "sufficient evidence of age discrimination" (*i.e.*, a collection of age-related comments made by his supervisor, Mr. Anderson) as "demonstrated by his . . . soliciting the help of a lawyer to combat his employer's practices" such that equitable tolling as measured from March 1, 2008, is inappropriate.  *Jones*, 331 F.3d at 1267; *see also Turlington v. Atlanta Gas Light Co.*, 135 F.3d 1428, 1435 (11th Cir. 1998) ("ADEA's timing requirements might have been equitably tolled if, in the period prior to the 180 days before filing the initial EEOC charge, Turlington had <u>no reason to believe he was a victim of unlawful discrimination</u>.") (emphasis added); *Turlington*, 135 F.3d at 1435 ("Moreover, Turlington <u>retained his district court counsel at least as of July 9, 1993</u>, upon being transferred out of the IS Department.") (emphasis added); *Turlington*, 135 F.3d at 1436 (citing *McClinton v. Ala. By-Products Corp.*, 743 F.2d 1483, 1487 (11th Cir.1984) ("rejecting equitable tolling where ADEA plaintiff '<u>suspects</u> that he may have been discriminated against on account of age and is also

17

<u>generally aware of his legal right</u> to obtain redress for that wrong'") (emphasis added)).   Accordingly, summary judgment in favor of State Farm is due to be entered on Mr. Leach's ADEA discrimination claim pursuant to the alternative basis of untimeliness.

### B.   ADEA Retaliation

#### 1.   Standard

"To establish a *prima facie* case of retaliation, [Mr. Leach] must show that (1) []he engaged in ADEA protected expression; (2) []he suffered an adverse employment action; and (3) the adverse action was causally related to the protected expression."[8] *See Stone v. Geico General Ins. Co.*, 279 Fed. Appx. 821, 822 (11th Cir. 2008) (citation omitted) (11th Cir. 2001).   "To establish that []he engaged in ADEA protected expression, [Mr. Leach] must show that []he 'had a good faith, reasonable belief that the employer was engaged in unlawful employment practices.'" *Stone*, 279

---

[8]   The court notes that prior to the Eleventh Circuit's decision in *Stone*, the United States Supreme Court decided *Burlington N. & Santa Fe Ry.* Co. *v. White*, 548 U.S. 53 (2006), which enlarged "the type of employer conduct considered actionable [in Title VII retaliation cases] . . . from that which adversely affects the plaintiff's conditions of employment or employment status to that which has a materially adverse effect on the plaintiff, irrespective of whether it is employment or workplace-related."   *Crawford v. Carroll*, 529 F.3d 961, 973 (11th Cir. 2008) (footnote omitted).   The nature of the court's decision on summary judgment does not require it to reach the degree to which, if any, *Burlington* impacts the *prima facie* requirements of an ADEA retaliation claim.

Fed. Appx. at 823 (quoting *Weeks v. Harden Mfg. Corp.*, 291 F.3d 1307, 1311 (11th Cir. 2002) (citation and quotation omitted)). Mr. Leach's "subjective belief must be '*objectively* reasonable in light of the facts and record presented.'" *Stone*, 279 Fed. Appx. at 823 (citations omitted) (emphasis in original quoted source).

### 2.    Application

#### a.    Abandonment

In its Motion, State Farm maintains that Mr. Leach cannot establish a *prima facie* case of ADEA retaliation "[s]ince he engaged in no protected conduct." (Doc. 19 at 15 n.3). State Farm further defends against Mr. Leach's retaliation claim on a lack of any pretext. (Doc. 19 at 17).

In opposing State Farm's Motion, Mr. Leach makes no effort to respond to these arguments or otherwise support his purported ADEA retaliation count. Therefore, Mr. Leach has abandoned this claim, and as a result, it is appropriate for this court to dismiss it on summary judgment. *See, e.g.*, *Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1322 (11th Cir. 2001) (finding claim abandoned when argument not presented in initial response to motion for summary judgment); *McMaster v. United States,* 177 F.3d 936, 940-41 (11th Cir. 1999) (claim may be considered abandoned when district court is presented with no argument concerning a claim included in the plaintiff's complaint); *Road Sprinkler Fitters Local Union No. 669 v. Independent*

*Sprinkler Corp.,* 10 F.3d 1563, 1568 (11th Cir. 1994) (concluding that a district court "could properly treat as abandoned a claim alleged in the complaint but not even raised as a ground for summary judgment"); *Bute v. Schuller International, Inc.,* 998 F. Supp. 1473, 1477 (N.D. Ga. 1998) (finding unaddressed claim abandoned).

### b.   No Pretext Established

Alternatively, a dismissal of Mr. Leach's alleged ADEA retaliation claim is appropriate on summary judgment due to a failure of proof as to pretext.   In addressing the issue of pretext, the Supreme Court has clarified:

> Thus, a plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.
>
> This is not to say that such a showing by the plaintiff will *always* be adequate to sustain a jury's finding of liability.  Certainly there will be instances where, although the plaintiff has established a *prima facie* case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory.  For instance, an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, non-discriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.

*Reeves*, 530 U.S. at 148 (emphasis in original) (citations omitted).  Therefore, despite a plaintiff's efforts to demonstrate an issue of fact regarding the truthfulness of an employer's asserted justification for an adverse employment decision,  judgment as

a matter of law in favor of the employer would still be appropriate on a retaliation claim if the record:  1) conclusively demonstrates some other, non-retaliatory basis for the decision; or 2) reveals only a weak issue of fact coupled with plentiful evidence that no illegal retaliation took place.

In the context of his ADEA retaliation count, Mr. Leach has not met his burden of establishing pretext.  For example, unlike the record of the purported "ageist" comments made by Mr. Anderson, here there is no similar body of evidence that he harbored any <u>retaliatory</u> animus against Mr. Leach.  Accordingly, the "cat's paw" theory cannot apply to Mr. Leach's ADEA retaliation claim because regardless of any potential age-motivated manipulation by Mr. Anderson, <u>there is no evidence that Mr. Anderson possessed any retaliatory intent</u>.

The mere fact that Mr. Anderson may have manipulated Mr. Turner and/or Mr. Anderson due to an age-related bias, without more, certainly does not satisfy the "cat's paw" standard with respect to a separately asserted retaliation count, especially in the absence of any authority cited by Mr. Leach in which a court has so held under comparable circumstances. *Cf. Flanigan's Enters., Inc. v. Fulton County, Ga.*, 242 F.3d 976, 987 n.16 (11th Cir. 2001) (holding that a party waives an argument if the party "fail[s] to elaborate or provide any citation of authority in support" of the argument); *Ordower v. Feldman*, 826 F.2d 1569, 1576 (7th Cir. 1987) (stating that

an argument made without citation to authority is insufficient to raise an issue before the court).

Also, Mr. Leach has not offered any comparator evidence, *i.e.*, examples of other litigators who engaged in a similar pattern of uncivil and unprofessional conduct similar to Mr. Leach and who did not engage in any ADEA-statutorily protected conduct, but who, nevertheless, remained employed by State Farm.  "'If a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate *where no other evidence of discrimination [or retaliation] is present*.'"  *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1092 (11th Cir. 2004) (citations omitted).

Additionally absent from the record is any evidence that Mr. Davis or Mr. Turner harbored a retaliatory animus against persons who exercise their statutorily-protected rights.  Therefore, Mr. Leach has not demonstrated pretext through any evidence suggesting that a retaliatory bias may have infected the decision-making process concerning his separation from State Farm.

Finally, in lieu of showing pretext, Mr. Leach specifically disputes that he ever said anything offensive to Mr. Anderson and generally questions the propriety of State Farm's decision to discharge him.  However, in doing so, Mr. Leach misses the mark because the crucial examination at the pretext level is whether the employer has

22

honestly explained its actions, not whether the employer is "right":[9]

> Federal courts "do not sit as a super-personnel department that reexamines an entity's business decisions.  No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, the ADEA does not interfere.  Rather, our inquiry is limited to whether the employer gave an honest explanation of its behavior."  *Mechnig v. Sears, Roebuck & Co.*, 864 F.2d 1359, 1365 (7th Cir. 1988) (citations omitted).  "[F]or an employer to prevail the jury need not determine that the employer was correct in its assessment of the employee's performance; it need only determine that the defendant in good faith *believed* plaintiff's performance to be unsatisfactory . . . ."  *Moore v. Sears, Roebuck & Co.*, 683 F.2d 1321, 1323 n.4 (11th Cir. 1982) (emphasis in original).  *See also Jones*, 874 F.2d at 1540; *Smith v. Papp Clinic, P.A.*, 808 F.2d 1449, 1452-53 (11th Cir. 1987) ("[I]f the employer fired an employee because it honestly believed that the employee had violated a company policy, even if it was mistaken in such belief, the discharge is not 'because of race' and the employer has not violated § 1981.").

*Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991) (emphasis added).  In this instance, Mr. Leach has not adduced sufficient evidence showing that the explanation provided by State Farm for ending his employment was instead, a ruse, designed to mask the true reason of retaliation under the ADEA.  Accordingly, summary judgment in favor of State Farm with respect to Mr. Leach's retaliation count is appropriate for this separate reason.

---

[9]  While under the "cat's paw" theory, disputed discipline by a purportedly biased supervisor may become relevant, no grounds for applying the framework to Mr. Leach's ADEA retaliation claim exist for the reasons explained above.

### 3.    Timeliness

Alternatively, Mr. Leach's retaliation claim premised upon the ADEA is untimely for the same reasons that equitable tolling does not save his ADEA discrimination claim as set out in § IV.A.3 above.

## C.    FMLA Interference

### 1.    Standard

29 U.S.C.A. § 2612 sets forth an employee's entitlement to leave under the FMLA and provides in relevant part that:

> Subject to section 2613 of this title, <u>an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period</u> for one or more of the following:
>
> > **(C)** <u>In order to care for the spouse,</u> or a son, daughter, or parent, of the employee, if such spouse, son, daughter, or parent has a serious health condition.

29 U.S.C. § 2612(a)(1)(C) (emphasis added).

The prohibition against interference provision of the FMLA provides:

> (a)  Interference with rights
>
> > (1) Exercise of rights
> >
> > It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter.

29 U.S.C. § 2615(a)(1).   Further, with respect to a claim for interference under the

FMLA:

> "[A]n employee need only demonstrate by a preponderance of the evidence that he was entitled to the benefit denied." *Strickland v. Water Works and Sewer Bd. of Birmingham*, 239 F.3d 1199, 1206-07 (11th Cir. 2001). The employee need not allege that his employer intended to deny the benefit, because "the employer's motives are irrelevant." *Id.* at 1208.

*Krutzig v. Pulte Home Corp.*, 602 F.3d 1231, 1235 (11th Cir. 2010) (emphasis added).

Finally, 29 U.S.C. § 2617(a) sets forth the enforcement mechanisms available to an employee who pursues a civil action under the FMLA against an employer who violates § 2615.

### 2.    Application

Without citing to any case authority,[10] Mr. Leach first faults State Farm for not expressly telling him about his right to FMLA leave. (Doc. 21 at 14 ("On either occasion, the Defendant should have informed the Plaintiff of his right to FMLA leave, including his right to return after taking such leave.")). However, as State Farm correctly points out, the Supreme Court's decision in *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81 (2002), holds that the regulatory failure to specifically notify an employee "that part of [an] absence would count as FMLA leave" does not

---

[10]  *See supra* at 21-22 (citing *Flanigan's* and *Ordower*).

constitute a violation of the statute so long as a statutorily sufficient duration of leave
is provided:

> When the parties filed cross-motions for summary judgment,
> Wolverine conceded it had not given Ragsdale specific notice that part
> of her absence would count as FMLA leave. <u>It maintained, however,
> that it had complied with the statute by granting her 30 weeks of
> leave-more than twice what the Act required.</u> The District Court granted
> summary judgment to Wolverine. In the court's view the regulation was
> in conflict with the statute and invalid because, in effect, it required
> Wolverine to grant Ragsdale more than 12 weeks of FMLA-compliant
> leave in one year. The Court of Appeals for the Eighth Circuit agreed.
> 218 F.3d 933 (2000).
>
> We granted certiorari, 533 U.S. 928, 121 S. Ct. 2548, 150 L. Ed.
> 2d 716 (2001), and now affirm. . . .
>
> The challenged regulation is invalid because it alters the FMLA's
> cause of action in a fundamental way: It relieves employees of the
> burden of proving any real impairment of their rights and resulting
> prejudice. <u>In the case at hand, the regulation permitted Ragsdale to
> bring suit under § 2617, despite her inability to show that Wolverine's
> actions restrained her exercise of FMLA rights.</u> <u>Section 825.700(a)
> transformed the company's failure to give notice-along with its refusal
> to grant her more than 30 weeks of leave-into an actionable violation of
> § 2615.</u> This regulatory sleight of hand also entitled Ragsdale to
> reinstatement and backpay, even though reinstatement could not be said
> to be "appropriate" in these circumstances and Ragsdale lost no
> compensation "by reason of" Wolverine's failure to designate her
> absence as FMLA leave. By mandating these results absent a showing
> of consequential harm, the regulation worked an end run around
> important limitations of the statute's remedial scheme.

*Ragsdale*, 535 U.S. at 85-86, 90-91 (emphasis added).

Therefore, comparable to *Ragsdale*, this court finds that Mr. Leach has no

cognizable FMLA interference claim simply because State Farm failed to designate its allowance of a fourteen week unpaid absence to Mr. Leach from November 24, 2007, through February 29, 2008, as FMLA-protected leave.  Relatedly, the fact that Mr. Leach voluntarily decided to end his unpaid leave early by retiring from State Farm on January 1, 2008 (and thereby cutting short the previously bestowed, FMLA-compliant fourteen week period), does not somehow translate into an actionable FMLA interference violation.  Therefore, summary judgment in favor of State Farm is appropriate because Mr. Leach has not shown that his employer denied him any FMLA benefit.

Secondarily, and apparently in reliance upon § 2614(a)(1) of the FMLA,[11] Mr.

---

[11]  This restoration to position provision generally states:

Except as provided in subsection (b) of this section, any eligible employee who takes leave under section 2612 of this title for the intended purpose of the leave shall be entitled, on return from such leave--

**(A)** to be restored by the employer to the position of employment held by the employee when the leave commenced; or

**(B)** to be restored to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment.

29 U.S.C. § 2614(a)(1)(A)-(B).

Leach also complains that:

> [State Farm] was further obligated to allow the Plaintiff to return to his previous position, or an equivalent one.  Clearly, this did not happen, as the Defendant either terminated the Plaintiff on November 20, 2007, or accepted his resignation on January 1, 2008, after informing the Plaintiff that he would be terminated.  <u>In either case, the Plaintiff was not allowed to return to his previous position or an equivalent position</u>.  Firing an employee is not the same as allowing him FMLA-protected leave.

(Doc. 21 at 14 (emphasis added)).

In *Strickland*, the Eleventh Circuit examined the parameters surrounding an employee's right to be restored to his former or equivalent position after taking FMLA leave:

> Strickland's second theory of recovery is based on the substantive FMLA right to reinstatement; an employee returning from covered leave is entitled to be restored to his former position or its equivalent. 29 U.S.C. § 2614(a)(1); *O'Connor*, 200 F.3d at 1354. <u>An employer can deny the right to reinstatement, however, if it can demonstrate that it would have discharged the employee had he not been on FMLA leave</u>. *O'Connor*, 200 F.3d at 1354; *see* 29 U.S.C. § 2614(a)(3) (qualifying the right to reinstatement so that an employee returning from FMLA leave is not entitled to "any right, benefit, or position of employment other than any . . . to which the employee would have been entitled had the employee not taken the leave"). <u>In other words, if an employer can show that it refused to reinstate the employee for a reason wholly unrelated to the FMLA leave, the employer is not liable</u>.
>
> <u>The Water Works Board relies on this affirmative defense in contesting Strickland's interference claim</u>.  It says that its reason for discharging Strickland had nothing to do with his purported FMLA leave; it terminated his employment on March 5 for failing to follow

> Harmon's directions in handling the customer's water-bill complaint. <u>If the record established without dispute that the Board discharged Strickland for this reason, we would affirm</u>. The problem is that the letter the Board wrote to Strickland on March 14 notifying him of his termination stated that "your actions of March 5, 1997, including your insubordination and 'walking off the job' are considered tantamount to your resignation of employment and therefore you are being separated effective that date." <u>The letter made no mention of Strickland's purported unsatisfactory handling of the customer complaint</u>.

*Strickland*, 239 F.3d at 1208 (emphasis added) (footnote omitted).  Thus, the Eleventh Circuit reversed the district court's ruling granting the defendant's motion for summary judgment "because Strickland ha[d] established an interference claim sufficient for submission to a jury."  *Id.* at 1209; *see also Krutzig*, 602 F.3d at 1236 ("This court has previously concluded that, if an employer can show that it refused to reinstate an employee for a reason unrelated to FMLA leave, the employer is not liable for failing to reinstate the employee after the employee has taken FMLA leave.") (citing *Strickland*, 239 F.3d at 1208).

In this situation, unlike the circumstances in *Strickland*, Mr. Leach ended his allotted period of leave early by electing to retire from State Farm effective January 1, 2008, as he had accepted a position with the Law Office of Earl Lawson, P.C., Liberty Mutual's claims litigation office.  By voluntarily making this decision, Mr. Leach may have simultaneously extinguished any purported right to reinstatement or restoration to his former position under the FMLA because he no longer was a State

Farm employee; instead he was retired, and set to start employment with a new company making restoration to his former position with State Farm infeasible.  *See Newman v. State of Ala.*, 683 F.2d 1312, 1317 (11th Cir. 1982) ("<u>No action by this court could change what has been done</u>, and 'federal courts are without power to decide questions that cannot affect the rights of litigants in the case before them.'") (quoting *North Carolina v. Rice*, 404 U.S. 244, 246 (1971) (emphasis added)); *cf. Underwood v. Alabama State Bd. of Educ.*, ___ So. 3d ___, 2009 WL 4506578, at *8 (Ala. 2009) ("Upon Byrne's resignation as chancellor, the ultimate relief sought by the plaintiffs became a reality; therefore, there is now no justiciable controversy, and any declaration by the Court in this declaratory-judgment action would be meaningless."); *id.* at *7 ("Similarly, in *City of Mobile v. Scott*, *supra*, <u>when a challenged employment contract terminated before a decision on the merits</u> could be issued, we held as follows:  'Where the chief of police <u>sought restoration to the office</u> from which he allegedly had been wrongfully removed, this court dismissed his appeal [as moot] where he had been legally removed from office after the appeal was taken.'") (emphasis added) (citation omitted).

More importantly, State Farm has affirmatively shown that its refusal to restore Mr. Leach to his former position (after permitting him to remain employed on unpaid leave for the purpose of continuing his medical insurance coverage) was, indeed, "for

a reason wholly unrelated to the FMLA leave[.]" More particularly, State Farm has affirmatively shown that rather than dismissing Mr. Leach shortly after the conclusion of the investigation into the email incident, Mr. Davis postponed the termination effective date so that Mr. Leach (and his wife) could continue to receive health care benefits from State Farm while Mr. Leach was on leave.

Additionally, State Farm has provided a clear and consistent explanation about its decision to terminate Mr. Leach's employment, *i.e.*, insubordination on October 23, 2007, relating to his transmission of an inappropriate email as well as an overall pattern of incivility.[12] Moreover, State Farm's rationale is strongly supported by the evidence contained in the record, and Mr. Leach has not "established an interference claim sufficient for submission to a jury." *Strickland*, 239 F.3d at 1209. Therefore, the record "establish[es] beyond dispute that [State Farm] would have discharged [Mr. Leach] had he *not* taken FMLA leave." *Martin v. Brevard County Public Schools*, 543 F.3d 1261, 1267 (11th Cir. 2008). Accordingly, State Farm cannot be held liable to Mr. Leach for FMLA interference due to the decision not to reinstate

---

[12] While the court has found that evidence supporting the application of the "cat's paw" theory means that Mr. Anderson's age-related bias may have resulted in the manipulation of Mr. Turner, the recommender, and Mr. Davis, the final decisionmaker, with respect to the firing of Mr. Leach, such a conclusion concerning the potential of age discrimination under the ADEA does not mean State Farm has been inconsistent when explaining its treatment of Mr. Leach and does not create a triable issue of FMLA interference.

him when he retired effective January 1, 2008.

Alternatively, even if this court were to consider November 20, 2007, as Mr. Leach's last day worked and treat his claim instead as one for the interference with the right to commence FMLA leave, the fact that Mr. Leach did receive a mixture of paid and unpaid leave from State Farm beginning on October 23, 2007, the date of the email incident, continuing through November 20, 2007, the date on which he learned of his future dismissal, and ending on January 1, 2008, the effective date of Mr. Leach's retirement, renders such FMLA leave theory flawed.  In particular, because State Farm delayed Mr. Leach's termination date until February 29, 2008, rather than immediately (and completely) dismissing him effective November 20, 2007, there was no actionable interference with Mr. Leach's commencement of his leave period.

Additionally, to the extent that Mr. Leach contends that a FMLA constructive commencement claim exists under these facts, the same "reason wholly unrelated to the FMLA leave" defense would equally apply to State Farm's treatment of Mr. Leach.  In *Krutzig*, the Eleventh Circuit held (in harmony with the Sixth, Eighth, and Tenth Circuits as cited therein) that "<u>the right to commence FMLA leave is not absolute</u>, and that an employee can be dismissed, preventing her from exercising her right to commence FMLA leave, without thereby violating the FMLA, <u>if the</u>

employee would have been dismissed regardless of any request for FMLA leave." *Id.*, 602 F.3d at 1236 (emphasis added).   Therefore, because State Farm has affirmatively proven that its reason for firing Mr. Leach has no relationship to any FMLA leave, it cannot be held liable under a theory that it interfered with Mr. Leach's right to commence leave by effectively discharging him on November 20, 2007.

### D.      FMLA Retaliation

#### 1.      Standard

Regarding a circumstantial evidence case of FMLA retaliation, the Eleventh Circuit has explained:

> When evaluating a claim of retaliation under the FMLA, in the absence of direct evidence of discrimination on the part of the employer, we apply the burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), for evaluating Title VII retaliatory discharge claims.  *See Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1275, 1283 (11th Cir. 1999) (affirming based on the holding and rationale of the district court's order, which in turn applied the *McDonnell-Douglas* framework); *see also King v. Preferred Technical Group*, 166 F.3d 887, 891-92 (7th Cir. 1999) ("We find no reason to treat an intent-based FMLA claim . . . any differently than other retaliatory discharge cases."); *Chaffin v. John H. Carter Co., Inc.*, 179 F.3d 316, 319 (5th Cir. 1999) (applying the *McDonnell Douglas* framework to evaluate claims that an employee was penalized for exercising rights protected by the FMLA in the absence of direct evidence of discrimination); *Hodgens v. General Dynamics Corp.*, 144 F.3d 151, 160 (1st Cir. 1998) (same); *Morgan v. Hilti, Inc.*, 108 F.3d

1319, 1323 (10th Cir. 1997) (same).

> In order to establish a *prima facie* case of retaliatory discharge or retaliation using the *McDonnell Douglas* framework, a plaintiff must show that (1) she engaged in statutorily protected conduct; (2) she suffered an adverse employment action; and (3) there is a causal connection between the protected conduct and the adverse employment action. *See Parris v. Miami Herald Pub'g Co.*, 216 F.3d 1298, 1301 (11th Cir. 2000); *Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 587 (11th Cir. 2000) (Title VII); *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1336 (11th Cir. 1999) (ADA).

*Brungart v. BellSouth Telecommunications, Inc.*, 231 F.3d 791, 798 (11th Cir. 2000).[13]

### 2.    Application

Assuming without deciding that Mr. Leach has established a *prima facie* case of FMLA retaliation, a dismissal of this claim is still appropriate on summary judgment due to a failure of proof as to pretext.  More specifically, for all the reasons set forth in § IV.B.2.b above, Mr. Leach has not adduced sufficient evidence showing that the explanation given by State Farm for terminating his employment was instead, a subterfuge for retaliation under the FMLA.  Not only did Mr. Leach receive leave from State Farm, but also the record shows no evidence of any retaliatory influence

---

[13] The nature of the court's decision on summary judgment does not require it to reach the degree to which, if any, *Burlington* affects establishing a *prima facie* case of FMLA retaliation.  *See also* n.8, *supra*.

or intent behind Mr. Leach's dismissal. *See, e.g., Gamba v. City of Sunrise*, 157 Fed. Appx. 112, 113 (11th Cir. 2005) ("Although Gamba contends his termination was in retaliation for having requested leave under FMLA, the City's position that he was terminated after numerous documented instances of unsatisfactory job performance is well-supported by the record.").

## V.    CONCLUSION

Accordingly, State Farm's Motion is due to be granted.  A separate order dismissing Mr. Leach's case with prejudice will be entered.

**DONE** and **ORDERED** this the 28th day of June, 2010.

**VIRGINIA EMERSON HOPKINS**
United States District Judge